******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DEVON D.*
(SC 19379)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Robinson, Js.**

*Argued January 22—officially released June 14, 2016*

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Anne Mahoney*, senior assistant state's attorney, for the appellant (state).

*James B. Streeto*, senior assistant public defender, for the appellee (defendant).

*Opinion*

ZARELLA, J. After a jury trial, the defendant, Devon D., was convicted of four counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), three counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (1), and four counts of risk of injury to a child in violation of § 53-21 (a) (2). The charges were brought in three separate informations and involved allegations made by three of the defendant's biological children—C1, C2 and C3.[1] From the judgments of conviction, the defendant appealed to the Appellate Court, which concluded that the trial court had abused its discretion in two ways— by permitting the three cases against the defendant to be tried jointly and by permitting C1 to testify with a dog at her feet for comfort and support. In the present appeal, the state contends that the Appellate Court incorrectly concluded that the trial court had abused its discretion in denying the defendant's motion to sever the three cases and in allowing a dog to be present with C1 during her testimony. We agree with the state.

The jury reasonably could have found the following relevant facts and procedural history. The defendant and his former girlfriend, GF, have several children together, including a girl, C1, and two boys, C2 and C3. After the defendant and GF separated in 2005, the children visited the defendant at his residence or at his mother's home. In October, 2009, seven year old C1 told GF that the defendant had put his "wee-wee" on her stomach and had touched her "private part" with his fingers. Erin Byrne, a clinical child interview specialist for the Children's Advocacy Center at Saint Francis Hospital and Medical Center, interviewed C1 in November, 2009, and in March, 2010. In the first interview, C1 "spoke about being in a bedroom [in her grandmother's house] with her father and that he had poured some lotion on her body, as well as poured the white stuff from his wee-wee on her body, and had contact with her genitals with his fingers." C1 also disclosed that the defendant had inserted his finger into her vagina while bathing her and using a rag, causing her to bleed. He also forced C1 and her siblings to watch a pornographic movie.

In the second interview, C1 told Byrne that the defendant had penetrated her "private part" with his penis, had attempted to penetrate her "butt" with his penis and had ejaculated on her several times. She also told Byrne that the defendant had forced her to perform fellatio on him, causing her to vomit. Additionally, C1 told Byrne that the defendant had told her that she might die from eating meat and that the reason he "does the nasty stuff" is to get the "meat" she had eaten "out" of her body. C1 told Byrne that the defendant had put vinegar, or a substance that stung, on her vagina and in her ear, and that he had tried to put his penis in her

ear, causing it to bleed. C1 stated that these incidents occurred in her grandmother's home on different days, and that the defendant had his clothes off or his pants pulled down each time. The defendant warned C1 not to say anything about these incidents.

Nine year old C2 also came forward with allegations against the defendant in November, 2009. In an interview with Stacy Karpowitz, a child forensic interview specialist with the Children's Advocacy Center, C2 stated that, on several occasions, the defendant had inserted a rag covered finger into his "butt hole" while C2 was bathing. C2 also stated that the defendant had rubbed C2's penis and made it go "up and down." In doing so, the defendant sometimes used a rag and sometimes used his hand. Finally, C2 stated that the defendant had made him watch a pornographic movie with his siblings and had warned him not to say anything.

Also, in November, 2009, Lisa Murphy-Cipolla, a clinical child interview supervisor with the Children's Advocacy Center, interviewed ten year old C3. C3 stated that the defendant had inserted his finger into C3's "butt" on more than one occasion, and that he had been using a rag, but the rag "slipped." The defendant also had squeezed C3's penis and had pulled back the foreskin on C3's penis on multiple occasions. C3 further stated that the defendant sometimes made him shower with C2, but he did not see the defendant do anything to C2. C3, however, had seen the defendant insert his finger into C1's "butt" on at least one occasion. Finally, C3 told Murphy-Cipolla that the defendant had made him watch a pornographic movie with his siblings and had warned him not to tell GF that the defendant was bathing him.

On the basis of these allegations, the defendant was arrested and charged with four counts of sexual assault in the first degree in violation of § 53a-70 (a) (2), three counts of risk of injury to a child in violation of § 53-21 (a) (1), and four counts of risk of injury to a child in violation of § 53-21 (a) (2). During a trial before a jury, the video-recorded interviews with C1, C2 and C3 were admitted into evidence as full exhibits, and all three recordings were played for the jury.

In its final charge to the jury, the trial court instructed: "In a criminal case in which the defendant is charged with a crime exhibiting abhorrent and compulsive sexual criminal behavior, evidence of the defendant's commission of another offense or offenses is admissible and may be considered for its bearing on any matter to which it is relevant. So for these three cases, you may use [C2's] and [C3's] testimony in this fashion in [C1's] case. In [C2's] case, you may use [C1's] and [C3's] testimony for this specific purpose. In [C3's] case, [C1's] and [C2's] testimony.

"However, evidence of another offense on its own is

not sufficient to prove the defendant guilty of the crime or crimes charged in the informations. Bear in mind as you consider this evidence that, at all times, the state has the burden of proving beyond a reasonable doubt that the defendant committed each of the elements of the offense or offenses charged in each information. I remind you that the defendant is not on trial for any act, conduct, or offense not charged in the informations. With regard to propensity evidence, like other evidence, you decide to give it the weight you find reasonable." Defense counsel did not object or take exception to the trial court's instructions to the jury.

After the jury returned verdicts of guilty as to all counts, the trial court rendered judgments in accordance with the verdicts. The defendant then appealed to the Appellate Court, which reversed the judgments of conviction and remanded the cases for new trials. *State* v. *Devon D.*, 150 Conn. App. 514, 550, 90 A.3d 383 (2014). We granted the state's petition for certification to appeal from the judgment of the Appellate Court.[2] Additional facts will be set forth as necessary.

I

The first question in this certified appeal is whether the Appellate Court incorrectly concluded that the trial court had abused its discretion in denying the defendant's motion to sever the three cases against him. The state contends that the cases properly were joined for trial because the evidence in each case would have been admitted as prior misconduct in the other cases. We agree with the state.

The following procedural history and facts are relevant to our resolution of this claim. On March 29, 2011, the defendant filed a motion to sever the cases against him. During argument before the trial court, defense counsel claimed that the main concern was that the jury would aggregate the evidence against the defendant, so that, even if the evidence on any single charge would not persuade the jury of his guilt, "the sum total of all the charges . . . may persuade the jury that he's guilty of all of them." Counsel further argued that, because the case concerning C1 was more brutal and shocking than the cases concerning C2 and C3, the jurors might find the evidence in the first case so offensive that they would not be able to deliberate objectively with respect to the remaining two cases. Finally, defense counsel argued that the cases should be tried separately because they were complex, involving multiple charges, children, witnesses, interviewers and police officers, and because curative instructions would not be sufficient to overcome the potential prejudice of trying the cases jointly.

The state responded that the trial would not be lengthy or overly complex because it involved easily separable fact patterns. The state emphasized that many

of the witnesses would be called in all three cases and that, under *State* v. *DeJesus*, 288 Conn. 418, 470–74, 953 A.2d 45 (2008), it expected that evidence in the three cases would be cross admissible. Finally, the state noted that each case was "shocking on its own, so one of them is not more shocking than the other." Defense counsel refuted the state's contention that the evidence in each case would be admissible as prior misconduct in the other cases, pointing to the fact that the victims were different ages, that two victims were male and one was female, and that the allegations involved different types of penetration.

After hearing arguments from counsel, the trial court acknowledged that the allegations in all three cases were brutal and shocking and recognized the potential effect on the jurors. The trial court also noted the difficulties involved in satisfying the *Boscarino* test, which requires a showing that the cases are discrete and easily distinguishable, versus the *DeJesus* test, which requires a showing that the cases are similar. After considering these and other factors, including the effect of the trial on the child victims, the applicable case law, the court's ability to permit jurors to take notes and to provide cautionary instructions, and judicial economy, the court denied the motion for severance. The court noted in particular that the cases involved "discrete and easily distinguishable factual features," that the trial would not be lengthy or complex, and that, because the allegations in all three cases were equally brutal and shocking, "[t]he jurors are going to be shocked to some extent in all three of these [cases]."[3]

The standards for reviewing a trial court's ruling on a motion pertaining to joinder are discussed at length in our decisions in *State* v. *LaFleur*, 307 Conn. 115, 159, 51 A.3d 1048 (2012), and *State* v. *Payne*, 303 Conn. 538, 544–50, 34 A.3d 370 (2012). In those cases, we rejected the notion of a blanket presumption in favor of joinder[4] and clarified that, when charges are brought in separate informations, and the state seeks to join those informations for trial, "the state bears the burden of proving that the defendant will not be substantially prejudiced by joinder pursuant to Practice Book § 41-19. The state may satisfy this burden by proving, by a preponderance of the evidence, either that the evidence in the cases is cross admissible or that the defendant will not be unfairly prejudiced pursuant to the factors set forth in *State* v. *Boscarino*, 204 Conn. 714, 722–24, 529 A.2d 1260 (1987).[5] *State* v. *Payne*, supra, [549–50]." (Footnote added; internal quotation marks omitted.) *State* v. *LaFleur*, supra, 157. Although the state bears the burden of proof in the trial court, "[i]t is the defendant's burden on appeal to show that joinder was improper by proving substantial prejudice that could not be cured by the trial court's instructions to the jury . . . ." (Internal quotation marks omitted.) Id., 158. As we emphasized in *LaFleur*, "our appellate standard of review remains

intact. Accordingly, [i]n deciding whether to [join informations] for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb." (Internal quotation marks omitted.) Id.

We start our analysis by determining whether the evidence in the cases concerning C1, C2 and C3 was cross admissible, such that evidence in each case would have been admissible as prior misconduct in the other cases. In *DeJesus*, we set forth the following standards for determining when evidence of prior sexual misconduct is admissible: "[E]vidence of uncharged sexual misconduct properly may be admitted in sex crime cases to establish that the defendant had a tendency or a propensity to engage in aberrant and compulsive criminal sexual behavior if: (1) the trial court finds that such evidence is relevant to the charged crime in that it is not too remote in time, is similar to the offense charged and is committed upon persons similar to the prosecuting witness; and (2) the trial court concludes that the probative value of such evidence outweighs its prejudicial effect. In assessing the relevancy of such evidence, and in balancing its probative value against its prejudicial effect, the trial court should be guided by this court's prior precedent construing the scope and contours of the liberal standard pursuant to which evidence of uncharged misconduct previously was admitted under the common scheme or plan exception. Lastly, prior to admitting evidence of uncharged sexual misconduct under the propensity exception . . . the trial court must provide the jury with an appropriate cautionary instruction . . . ." *State* v. *DeJesus*, supra, 288 Conn. 476–77; see also Conn. Code Evid. § 4-5 (b) (effective January 1, 2012), in 73 Conn. L.J., No. 1, p. 211PB (July 5, 2011) (codifying propensity exception described in *DeJesus*).

Recognizing the difficulties of balancing the probative value of the evidence against its prejudicial effect, we have held that "the trial court's decision will be reversed only whe[n] abuse of [its] discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling. . . . *State* v. *Merriam*, 264 Conn. 617, 659–61, 835 A.2d 895 (2003)." (Internal quotation marks omitted.) *State* v. *Romero*, 269 Conn. 481, 497, 849 A.2d 760 (2004).

Applying these standards in the present case, we conclude that the trial court properly exercised its discretion in permitting the cases to be tried together because the evidence in all three cases was cross admissible.[6] Turning first to the question of relevancy, it is undisputed that the incidents alleged by C1, C2 and C3 were proximate in time because all of the alleged misconduct occurred between January 1, 2006, and August 31, 2009.

See, e.g., *State* v. *Jacobson*, 283 Conn. 618, 632–33, 930 A.2d 628 (2007) (upholding admission of uncharged misconduct that occurred approximately six and ten years before charged offenses). Second, it cannot reasonably be claimed that C1, C2 and C3 are not sufficiently similar witnesses. All three victims are prepubescent children of similar age who are the defendant's biological children. We are not convinced by the defendant's suggestion that the victims cannot be deemed similar witnesses simply because they do not share the same gender. This singular difference does not outweigh their shared attributes. See *State* v. *Romero*, supra, 269 Conn. 501 (although victims were different genders, both were prepubescent children who were of similar age when abuse began and were under defendant's care when it occurred).

Finally, the defendant's conduct with respect to each victim was sufficiently similar to demonstrate that he had a propensity toward aberrant sexual behavior. See, e.g., *State* v. *DeJesus*, supra, 288 Conn. 474–75. Because of the familial relationship, the defendant had access to and time alone with each victim. All of the sexual abuse occurred during the defendant's unsupervised visitation with the victims, either at his residence or his mother's residence. The defendant forced all of the victims to watch a pornographic movie. Although none of the victims needed help bathing, the defendant used the cover of bathing in each case as a means of touching them inappropriately. In each case, the defendant used a rag to maintain the pretense of washing, but, in each case, the purported washing resulted in digital anal or vaginal penetration. Not only did all three cases involve allegations that the defendant had used the rag to camouflage the inappropriate digital penetration, but all three victims also alleged that the defendant touched them inappropriately when he was not using the rag. Lastly, the defendant warned each victim not to tell anyone about his conduct. Given the extensive similarities between the conduct in the three cases, and in view of the liberal standard of admissibility governing the use of prior misconduct evidence in sexual assault cases, we cannot conclude that the trial court abused its discretion in denying the motion for severance.

We disagree with the Appellate Court's conclusions that "the only conduct arguably common to all three victims was the defendant's insertion of his finger into their 'butts' while they bathed" and that C1's allegations "reflect[ed] significant qualitative differences from the facts alleged in the cases involving C2 and C3 . . . ." *State* v. *Devon D.*, supra, 150 Conn. App. 529. Specifically, the Appellate Court focused on the following differences: (1) C1 alleged that the defendant was partially or fully undressed and that some of the abuse occurred in the bedroom, whereas C2 and C3 alleged that he remained clothed and that all of the abuse occurred in the bathroom; (2) C1 alleged penile penetration and

fellatio, in addition to digital penetration; and (3) the "alleged conduct toward C1 [unlike the conduct toward C2 and C3] in no way could have been mistaken for an aggressive bathing practice." Id., 528.

With respect to the similarity of the charged and uncharged misconduct, this court has repeatedly recognized that it "need not be so unusual and distinctive as to be like a signature . . . ." (Internal quotation marks omitted) *State* v. *Gupta*, 297 Conn. 211, 228–29, 998 A.2d 1085 (2010). Rather, the question is whether the evidence is sufficiently similar to demonstrate a propensity "to engage in the type of aberrant and compulsive criminal sexual behavior with which he . . . [was] charged." (Internal quotation marks omitted.) Id., 224. As we discussed previously in this opinion, the defendant engaged in multiple types of similar conduct with all three victims. The fact that the defendant was unclothed during his abuse of C1 and engaged in additional types of sexual misconduct with her does not outweigh these numerous similarities or erode the probative value of that evidence.

In addition, the fact that the defendant engaged in additional types of sexual misconduct with C1 does not render his conduct with her so much more severe and shocking than his conduct with C2 and C3 that severance is required. As the trial court noted, the allegations in all three cases were shocking, and the defendant's inappropriate touching and digital penetration of all three victims can only be characterized as severe. The fact that the defendant engaged in additional types of sexual misconduct with C1 does not render the defendant's conduct toward C2 and C3 any less severe. Even if the conduct toward C1 was significantly more egregious than his conduct toward C2 and C3, however, this court previously has upheld the admission of uncharged sexual misconduct when it differed in degree from the charged conduct. See, e.g., *State* v. *Jacobson*, supra, 283 Conn. 637–38; *State* v. *McKenzie-Adams*, 281 Conn. 486, 530–33, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007).

In *Jacobson*, the defendant hockey coach, Scott Jacobson, developed close relationships with two boys, M and B. *State* v. *Jacobson*, supra, 283 Conn. 622–23. He met with them frequently, gave them gifts, became friends with their mothers, invited them to sleep at his home and slept in the same bed with them. Id. M alleged that, during a sleepover, he awoke to find Jacobson performing oral sex on him. Id., 623. B alleged that, during a sleepover, he awoke to find Jacobson touching his penis with his hands and his mouth. Id., 624. B also alleged that, on subsequent occasions, Jacobson forced B to touch his penis and attempted to have B sodomize him. Id., 625. During trial, the court permitted K, the mother of a boy who had been involved in a close relationship with Jacobson, to testify as evidence of a

common scheme or plan. Id., 628–30. On appeal, this court rejected Jacobson's claim that K's allegations were not sufficiently similar to the allegations by M and B. See id., 637. We concluded that, "although [Jacobson] never sexually assaulted K's son, K's description of [Jacobson's] relationship with and actions toward her son—in particular, sleeping in the same bed with him at [Jacobson's] home—was sufficient to permit an inference that [Jacobson] was grooming K's son for the same kind of sexual abuse that [Jacobson] later inflicted on M and B." Id.

In *McKenzie-Adams*, the defendant high school teacher, Van Clifton McKenzie-Adams, was charged with multiple counts of sexual assault in connection with his relationships with two female students, N.R. and P.L. See *State* v. *McKenzie-Adams*, supra, 281 Conn. 490–91. The relationship with both victims began with intimate conversations in the school library, proceeded to embraces in the school hallway and ultimately resulted in sexual relations. See id., 491–95. The state also introduced the testimony of a third student, R.S., who testified that she and P.L. had had a conversation of a sexual nature with McKenzie-Adams in the school library and that he had embraced her in a sexual manner in the school hallways on several occasions. Id., 528. We concluded that the trial court properly exercised its discretion in admitting the testimony of R.S. as evidence of a common scheme or plan because McKenzie-Adams' sexual misconduct with R.S. was similar to his sexual misconduct during the initial stages of his relationships with both N.R. and P.L. See id., 530–31.

In the present case, the sexual misconduct in each case was much closer in degree of severity than in *Jacobson* and *McKenzie-Adams*. If anything, the basis for the cross admissibility of the evidence in the present case is stronger than in *Jacobson* or *McKenzie-Adams* given the extensive similarities between the victims and their allegations. Moreover, our holdings in *State* v. *Gupta*, supra, 297 Conn. 229, and *State* v. *Ellis*, 270 Conn. 337, 358, 852 A.2d 676 (2004), are consistent with our conclusion that the evidence was cross admissible. In both of those cases, the charged and uncharged misconduct did not share the significant similarities that are present here. In *Ellis*, two of the victims, Julia S. and Kristin C., played softball for the defendant coach, Robert Ellis, and alleged that he had touched their breasts inappropriately. *State* v. *Ellis*, supra, 344–46. The third victim, Sarah S., did not play softball on Ellis' team but was connected to him through her sister and her father. Id., 346. Ellis' conduct toward her started with explicit telephone conversations and then became physical. See id., 347–48. Ellis' behavior progressed from touching Sarah S. inappropriately, to exposing himself to her and attempting to force her to touch him with her hands and mouth, to digital penetration of her vagina and attempted penile penetration. Id., 347–49.

This court emphasized that "there were few similarities" between Ellis' abuse of Sarah S. and the other two victims. Id., 358.

Similarly, in *Gupta*, we specifically recognized that there were few similarities between the victims and the conduct alleged. In that case, the defendant physician, Sushil Gupta, touched two patients' breasts inappropriately during a medical examination. *State* v. *Gupta*, supra, 297 Conn. 215–17. With the third victim, who had been employed by Gupta's medical group for four years, Gupta engaged in far more overtly sexual behavior. See id., 217–19. In *Gupta*, as in *Ellis*, we emphasized the lack of similarity between the charged and the uncharged misconduct, emphasizing that "the only conduct common to all three victims" was that Gupta had felt the victims' breasts with his fingertips and grabbed them. Id., 226. In both cases, the uncharged misconduct had limited relevance because it shared virtually no similarities with the charged misconduct. That is not the case here.

Finally, we strongly disagree that, if the cases had been tried separately, the defendant in the present case could have raised a plausible claim that he was merely bathing C2 and C3. Cf. id., 222–33 (Gupta arguably could assert that improper touching of two victims' breasts was part of legitimate medical exam whereas his improper sexual comments and more overtly sexual acts toward third victim clearly did not constitute legitimate medical procedure). Notably, the defendant never claimed that joinder impaired his ability to assert such a theory with respect to C2 and C3, only that it made it likely that the jury would aggregate the evidence. Therefore, the state did not have an opportunity to make a proffer as to why such a claim would not be plausible. Accordingly, in view of the evidence presented by the state, it is clear that the facts simply would not support this assertion. C2, who was nine years old at the time of the abuse, testified that he had been bathing himself since he was five years old, that nothing had happened to make him especially dirty before the defendant bathed him, that the defendant never said anything to indicate that he was showing C2 how to clean himself appropriately, and that the defendant penetrated his anus in such a manner as to cause pain. C2 also testified that, on more than one occasion, the defendant touched C2's penis without the rag and made it go "up and down." C3, who was ten years old at the time of the abuse, offered similar testimony as to all of these circumstances, including that the defendant squeezed C3's penis and manipulated the foreskin of his penis on several occasions and for sufficient duration to cause pain. Given these allegations, the defendant could not make a credible claim that he was merely vigorously bathing C2 and C3.

Having determined that the misconduct evidence was

relevant to prove that the defendant had a propensity to engage in aberrant sexual behavior, we turn to whether the prejudicial value of the evidence outweighed its probative value. The defendant claims that the trial court did not address whether the prejudicial value of the evidence outweighed its probative value. He also claims that the trial court's instructions "exacerbated" the prejudicial effect of the misconduct evidence because "[t]he jury was told that [it was] to consider such evidence only to show that the defendant has a propensity to commit sex offenses." We disagree with both claims.

"We previously have held that the process of balancing probative value and prejudicial effect is critical to the determination of whether other crime[s] evidence is admissible. . . . At the same time, however, we . . . do not . . . requir[e] a trial court to use some talismanic phraseology in order to satisfy this balancing process. Rather . . . in order for this test to be satisfied, a reviewing court must be able to infer from the entire record that the trial court considered the prejudicial effect of the evidence against its probative nature before making a ruling." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *James G.*, 268 Conn. 382, 395, 844 A.2d 810 (2004). In conducting this balancing test, the question before the trial court "is not whether [the evidence] is damaging to the defendant but whether [the evidence] will improperly arouse the emotions of the jur[ors]." (Internal quotation marks omitted.) *State* v. *Smith*, 275 Conn. 205, 218, 881 A.2d 160 (2005).

In the present case, we are satisfied that the trial court weighed the prejudicial effect of the evidence against its probative value before ruling on the motion to sever. The court acknowledged the shocking nature of the allegations and recognized their potential effect on the jurors. The court also considered the interests of judicial economy, the effect of the trial on the child victims, the applicable case law and the ability to use cautionary instructions to mitigate any prejudice stemming from the shocking nature of the evidence. Only after balancing these numerous factors did the trial court deny the motion for severance.

We also reject the defendant's claim that the trial court's cautionary instructions "exacerbated" any prejudice to the defendant by informing the jurors that they could consider the uncharged misconduct evidence "only" to show that the defendant had a propensity to engage in such conduct. We do not agree that the defendant has properly characterized the trial court's instruction,[7] and, even if we did, there is no merit to this claim because *DeJesus* stands for the proposition that uncharged misconduct evidence in sexual assault cases "may be admitted in sex crime cases to establish that the defendant had a tendency or a propensity to

engage in aberrant and compulsive criminal sexual behavior"; *State* v. *DeJesus*, supra, 288 Conn. 476; and requires a cautionary instruction to that effect. Id., 477.

In sum, we conclude that the trial court properly exercised its discretion in permitting the three cases against the defendant to be tried jointly. The defendant cannot demonstrate that he was substantially prejudiced by the denial of his motion for severance because the evidence in all three cases would have been cross admissible to show that the defendant had a tendency or a propensity to engage in aberrant and compulsive sexual misconduct.

## II

The second issue in this certified appeal is whether the Appellate Court correctly concluded that the trial court had abused its discretion in permitting a dog to sit near C1 during her testimony to provide comfort and support. The state challenges the Appellate Court's conclusion, arguing that the trial court properly exercised its discretion by balancing its determination that the dog's presence likely would help C1 to provide complete and reliable testimony against the possibility of prejudice to the defendant. We agree with the state.

The following facts and procedural history are relevant to our resolution of this claim. On July 5, 2011, the state filed a motion to permit a dog "to sit in close proximity to [C1] during [C1's] testimony, provided that such dog and the dog's handler shall not obscure [C1] from the view of the defendant or the jury . . . ." The state filed the motion after C1, who was eight years old at the time of trial, "had indicated to the victim witness advocate that she was concerned about people looking at her in the courtroom . . . ." Recognizing that the state's motion presented an issue of first impression in Connecticut, the court determined that it would conduct a full evidentiary hearing in accordance with *State* v. *Jarzbek*, 204 Conn. 683, 704, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988), and would "apply the more exacting standard of clear and convincing [evidence] . . . ." The court emphasized that its "reading of the case law indicate[d] that [the hearing] might not be necessary, but it appears to be the more prudent course of action . . . ." The state did not object to the hearing but noted that it did not believe a hearing was necessary.

During the hearing, David Meyers, a licensed clinical social worker, testified that approximately 40 percent of his practice during the previous ten years had involved the treatment of child trauma victims, including victims of sexual assault. He testified that the dog that would sit near C1 during her testimony, Summer, had been trained to be a service dog and occasionally provided support to children in his practice who experienced anxiety. At the time of trial, Summer had not yet

been certified as a service dog[8] because she had only just reached the testing age of two. Meyers testified that he and Summer met C1 two hours before the hearing began. C1 initially refused to touch Summer but "became more and more comfortable as she began to pet her. She even touched her teeth and . . . sat with her on the floor and . . . appeared to be more connected and less fearful." Meyers explained that, in his practice, Summer "decreases people's level of anxiety, and she increases people's ability to engage and share difficult life situations." Meyers testified that he saw a similar response with C1 and that Summer's presence increased C1's ability to engage, to answer questions and to talk. After spending one hour with Summer, C1 was "more visibly relaxed, she was able to talk to [the prosecutor], she was able to talk to me about anecdotes about Summer and [was] visibly comfortable." According to Meyers, C1 said that having Summer near her would "help her feel more comfortable." When defense counsel asked Meyers whether he had any way of knowing "whether . . . [C1 would] be able to be more truthful, more reliable, have better memory of events that are a couple of years old with the presence of a dog or without a dog," Meyers responded that, in his experience, "when kids are anxious, they're less likely to be able to talk about those things, memories and life experiences. [C1] appeared less anxious during our time, so I'm not sure if that's a clear answer to your question, but it would be my opinion, as a dog handler child therapist, that she appeared more comfortable." In response to questioning from the court, Meyers explained that Summer would be able to lay still for five or six hours.

Defense counsel objected to the dog's presence, arguing that General Statutes § 54-86g (b),[9] which enumerates the procedures that a court may employ when a child testifies in a sexual assault case, does not contemplate the use of dogs. In response to questioning from the trial court, defense counsel clarified that he was *not* making a confrontation clause claim.[10] Rather, he claimed that the defendant's due process rights would be prejudiced because Summer's presence would improperly influence the jury by making it appear that C1 is someone with whom the jury should sympathize. Counsel suggested alternative procedures, such as having C1 testify outside the presence of the jury on closed circuit television or letting her hold a teddy bear or letting a trusted adult sit by her during her testimony. He also requested a curative instruction in the event that the court permitted Summer to be present. The state emphasized that it had considered counsel's suggestion to permit GF to sit with C1 but opted not to do so because the theory of the defense was that GF had coached her children to make false allegations against the defendant and because the procedure would defeat any sequestration order. The state also emphasized that

the court possessed the inherent discretionary authority, "separate and apart from [§ 54-86g]," to permit C1 to testify with Summer nearby. Although the state also had prepared a motion to permit C1 to testify outside of the courtroom, it indicated that it would not pursue that more drastic measure unless it became necessary.

Following the hearing, the court recognized the need to "balance the [defendant's] due process rights . . . against the need to provide an atmosphere in which all witnesses can testify and provide the truth reliably, fully and completely," and emphasized that the defendant was "entitled to the jury's direct observation of all witnesses." The court opined that permitting Summer to be present would prevent "the need for the more drastic and onerous" procedure of video recording C1's testimony.

After taking these considerations into account and applying a standard of clear and convincing evidence, the court concluded that it "should allow all reasonable tools to make the courtroom a place of comfort and reliability for any witness, but especially a child witness, who, it is alleged, has faced child sexual abuse." The court concluded that permitting Summer to be present was within its discretion, that C1's testimony would be assisted, but not directed, by Summer's presence, and that the defendant's rights would not be prejudiced by Summer's presence with proper curative instructions and safeguards. The court directed that Summer would be "put in place [on the witness stand] . . . in such a way that the dog will not be viewed by the jury in any way, shape or form,"[11] and solicited suggestions from counsel with respect to additional safeguards and curative instructions. Subsequently, counsel stipulated that the instructions would indicate that "[t]he witness is anxious about testifying in front of a group of people. The dog is not present due to any concern the witness has with the defendant's presence. The . . . dog met the witness [the day before] in preparation for court trial." The jury heard these instructions when the trial commenced, just before C1 testified, and as part of the court's final charge. Each time the court offered these instructions, it also admonished the jurors to disregard the presence of the dog, to draw no inference for or against any witness using a dog, that sympathy should play no part in its considerations or ultimate deliberation, and to "[t]hink of the dog like an interpreter, an aid to get the witness' testimony across to you more clearly."

On appeal to the Appellate Court, the defendant claimed that the trial court's ruling constituted an abuse of discretion and violated his confrontation and due process rights. See *State* v. *Devon D.*, supra, 150 Conn. App. 516, 538 and n.9. The Appellate Court concluded that, although the trial court had the inherent discretionary authority, apart from § 54-86g, to permit Summer

to sit near C1 while she testified, "the court abused its discretion in granting the state's motion to [use this procedure] . . . because there was no finding [or] . . . a showing . . . that this special procedure was needed."[12] Id., 549. Although the Appellate Court held that a showing of need was required, it did not discuss what constitutes a showing of need. The defendant argues, on appeal to this court, that, under *State* v. *Jarzbek*, supra, 204 Conn. 704, the state was required to prove a compelling need for Summer's presence. The state argues, to the contrary, that the procedures in *Jarzbek* do not apply under these circumstances and that "the question on appeal is whether the trial court abused its discretion in balancing the likelihood that the accommodation—in this case, the . . . dog— would help [C1] testify truthfully and completely by reducing . . . her stress or trauma against the potential for prejudice to the defendant." We agree with the state. After considering the record and relevant authority, we conclude that the trial court properly exercised its discretion in granting the state's motion for special procedures.

Whether a trial court may permit a dog to sit near a witness during testimony in a criminal trial to provide comfort and support presents a question of first impression for this court. With respect to statutory authority for such a procedure, we agree with the Appellate Court's analysis and conclusion that § 54-86g (b) does not specifically authorize the use of a dog. See *State* v. *Devon D.*, supra, 150 Conn. App. 541–42. As the Appellate Court noted, although § 54-86g enumerates various special procedures that the court may use when a child testifies in a case involving sexual assault or abuse, it does not list the use of a dog among the authorized procedures. Id., 542.

We further agree with the Appellate Court's conclusion that, although § 54-86g does not authorize such a procedure, the trial court has inherent discretionary authority, separate and apart from the statute, to order special procedures or accommodations to assist a witness in testifying. See id., 543. As the Appellate Court recognized, it is well established that "[t]he function of the court in a criminal trial is to conduct a fair and impartial proceeding. . . . A trial judge in a criminal case may take all steps reasonably necessary for the orderly progress of the trial. . . . When the rights of those other than the parties are implicated, [t]he trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice. . . . Moreover, [t]he [ability] of a witness [to testify reliably] is a matter peculiarly within the discretion of the trial court and its ruling will be disturbed only in a clear case of abuse or of some error in law." (Internal quotation marks omitted.) Id., quoting *State* v. *Torres*, 60 Conn. App. 562, 569–70, 761 A.2d 766 (2000), cert. denied, 255 Conn.

925, 767 A.2d 100 (2001). The trial court may, for example, exercise its discretion to permit a child to bring a special doll or comfort object from home. See *State* v. *Aponte*, 249 Conn. 735, 744–45, 738 A.2d 117 (1999); see also *State* v. *Torres*, supra, 569 (court did not abuse its discretion in permitting witness' fiancé to sit beside her while she testified); *State* v. *McPhee*, 58 Conn. App. 501, 506–508, 755 A.2d 893 (court did not abuse its discretion in permitting witness to hold stuffed animal while testifying), cert. denied, 254 Conn. 920, 759 A.2d 1026 (2000). We therefore agree with the Appellate Court's conclusion that the trial court possessed the broad discretionary authority to order special procedures to ensure that C1 was able to testify reliably.

We disagree, however, with the Appellate Court's conclusion that the trial court abused its discretion in permitting C1 to testify with Summer at her feet. *State* v. *Devon D.*, supra, 150 Conn. App. 550. Specifically, we disagree with the Appellate Court's conclusion that the trial court was required to make an express finding that "*there was a need for this special procedure* to be implemented for C1, and that use of such special procedure would not deny the defendant a fair trial." (Emphasis in original.) Id. We conclude that the pivotal question is not whether the special procedure is necessary but whether it will aid the witness in testifying truthfully and reliably.[13] We further conclude that the record in the present case demonstrates that the trial court expressly found that Summer would help C1 to testify more reliably and completely and that Summer's presence would not violate the defendant's right to a fair trial. Finally, the record indicates that the trial court took extensive measures to ensure that the jurors never saw Summer. On the basis of the record, we conclude that the trial court properly exercised its discretion.

We start our analysis by clarifying the applicable standard of review. Although we apply an abuse of discretion standard to review the trial court's decision to permit Summer to sit near C1 during her testimony, we engage in plenary review with respect to the standard and procedures that the trial court used in making this determination. See, e.g., *In re Tayler F.*, 296 Conn. 524, 537, 995 A.2d 611 (2010). With respect to those standards and procedures, the defendant argues that the trial court was required to find, by clear and convincing evidence, that the state had shown a compelling need for the use of Summer. See *State* v. *Jarzbek*, supra, 204 Conn. 707. The state contends that the compelling need test set forth in *Jarzbek* is not applicable because the defendant's right of confrontation is not at issue. We agree with the state and conclude that the appropriate standard is whether the trial court has balanced the extent that the special accommodation will aid the reliability of the witness' testimony against any possible prejudice to the defendant's right to a fair trial.

Because this court has not considered the appropriate standards and procedures that apply in this precise context, we turn to other jurisdictions for guidance. In the five cases in which courts have considered challenges to a trial court's decision to permit a dog to sit with a testifying witness to provide comfort and support, all have concluded that the trial court may exercise its discretion to permit such an accommodation. See *People* v. *Chenault*, 227 Cal. App. 4th 1503, 1517, 175 Cal. Rptr. 3d 1 (2014), review denied, California Supreme Court, Docket No. S220741 (Cal. October 15, 2014); *People* v. *Spence*, 212 Cal. App. 4th 478, 517, 151 Cal. Rptr. 3d 374 (2012), review denied, California Supreme Court, Docket No. S208415 (Cal. April 10, 2013); *People* v. *Tohom*, 109 App. Div. 3d 253, 266–67, 969 N.Y.S.2d 123 (2013), appeal denied, 22 N.Y.3d 1203, 9 N.E.3d 918, 986 N.Y.S.2d 423 (2014); *State* v. *Jacobs*, Docket No. 27545, 2015 WL 6180908, *6 (Ohio App. October 21, 2015), appeal denied, 145 Ohio St. 3d 1406, 46 N.E.2d 701 (2016); *State* v. *Dye*, 178 Wn. 2d 541, 553–55, 309 P.3d 1192 (2013). As the court noted in *Jacobs*, "[t]hese cases reveal three principles that guide us . . . . First, trial courts are in the best position to determine how to control trial proceedings, especially the mode of interrogating witnesses. Second, in light of the trial courts' position and their discretion, it is not erroneous for them to approve a variety of special allowances for child victims of sexual abuse. And, third, these special allowances may include using a . . . dog during the child victim's testimony under certain circumstances." *State* v. *Jacobs*, supra, *6.

In each of these cases, the appellate court upheld the trial court's exercise of discretion when it was clear from the record that the dog's presence "would likely assist or enable [the witnesses] to testify completely and truthfully without undue harassment or embarrassment"; *People* v. *Chenault*, supra, 227 Cal. App. 4th 1520; would make the witness feel " 'more comfortable' "; *State* v. *Jacobs*, supra, 2015 WL 6180908, *6; would alleviate the witness' anxiety and help her to more easily discuss the conduct at issue; *People* v. *Tohom*, supra, 109 App. Div. 3d 267; or would serve to facilitate the testimony of a witness who was significantly anxious about testifying and who had developmental disabilities. *State* v. *Dye*, supra, 178 Wn. 2d 554, 557.

In *Chenault*, the California Court of Appeal held that "[i]nstead of requiring a case-specific finding that an individual witness needs the presence of a . . . dog . . . in exercising its discretion . . . a trial court should consider the particular facts of the case and the circumstances of each individual witness and determine whether the presence of a . . . dog would assist or enable that witness to testify without undue harassment or embarrassment and provide complete and truthful

testimony. . . . If the trial court finds that the presence of a . . . dog would likely assist or enable the individual witness to give complete and truthful testimony and the record supports that finding, the court generally will act within its discretion . . . by granting a request for the presence of the . . . dog when that witness testifies." (Footnote omitted.) *People* v. *Chenault*, supra, 227 Cal. App. 4th 1517. After reviewing the record in *Chenault*, the California Court of Appeal held that the trial court properly exercised its discretion, noting that it "made implicit findings that the presence of [the dog] . . . would assist or enable [the child victims] to testify completely and truthfully without undue harassment or embarrassment." Id., 1520; see also *People* v. *Tohom*, supra, 109 App. Div. 3d 256–58, 267 (upholding decision to allow dog to accompany child witness during her testimony when social worker testified that dog would decrease witness' anxiety, allow her to communicate better, and better express herself). We find the reasoning in *Chenault* and *Tohom* persuasive because it focuses the trial court's attention on the central question of whether a special accommodation will serve to aid a witness in testifying reliably and completely. Such testimony, in turn, helps to ensure a fair and impartial trial.

We also agree with the state that the compelling need standard set in *Jarzbek* does not apply in the present case because the defendant's right of confrontation is not at issue. In *State* v. *Jarzbek*, supra, 204 Conn. 684, this court considered whether a child victim in a case involving alleged sexual abuse could testify through the use of a video recording made outside the defendant's physical presence. Because this procedure necessarily infringed on the defendant's constitutional right of confrontation, this court concluded that "a trial court must determine, at an evidentiary hearing, whether the state has demonstrated a compelling need for excluding the defendant from the witness room during the [video recording] of a [child] victim's testimony." Id., 704. This court also held that the state "bears the burden of proving such compelling need by clear and convincing evidence." Id., 705.

The rigorous procedures set forth in *Jarzbek* are not appropriate in the present case because the defendant's right of confrontation is not at issue. See, e.g., *State* v. *McPhee*, supra, 58 Conn. App. 507–508 (declining to extend *Jarzbek* standard to case in which defendant claimed special accommodations to witness aroused jurors' sympathies). Defense counsel informed the trial court that the defendant was not claiming that Summer's presence violated his right of confrontation, and the defendant makes no claim on appeal that Summer interfered with counsel's ability to cross-examine C1 or impeded his view or the jury's view of C1. In fact, as the trial court noted, permitting Summer to sit near C1 during her testimony was intended to obviate the

need for the more drastic measure of securing C1's testimony by video recording.

We conclude that the trial court may exercise its discretion to permit a dog to provide comfort and support to a testifying witness. Before doing so, the court must balance the extent to which the accommodation will help the witness to testify reliably and completely against any possible prejudice to the defendant's right to a fair trial. The trial court should consider the particular facts and circumstances for the request to have a dog accompany the particular witness, the extent to which the dog's presence will permit the witness to testify truthfully, completely and reliably, and the extent to which the dog's presence will obviate the need for more drastic measures to secure the witness' testimony. The trial court should balance these factors against the potential prejudice to the defendant and the availability of measures to mitigate any prejudice, such as limiting instructions and procedures to limit the jury's view of the dog.

Applying these standards in the present case, we conclude that the trial court properly exercised its discretion in permitting Summer to sit near C1 during her testimony. The court heard testimony that C1 was anxious about testifying, that children who are anxious are less likely to be able to talk about their experiences, and that Summer made C1 feel more comfortable. Meyers testified that Summer helped C1 to be less anxious and more verbal, to engage, to answer questions, and to talk. On the basis of this evidence, the court found that C1's testimony would be "supported and assisted in an appropriate manner by [Summer's] presence . . . ."

The court recognized its duty to "balance the [defendant's] due process rights . . . against the need to provide an atmosphere in which all witnesses can testify and provide the truth reliably, fully and completely." In doing so, the court considered a number of factors, including that the defendant was "entitled to the jury's direct observation of all witnesses," that a dog would not be able to coach C1's testimony, and that permitting Summer to sit near C1 during her testimony would obviate the need for capturing C1's testimony through a video recording. After considering these factors, the court concluded that the defendant's rights would not be prejudiced by Summer's presence. Moreover, the jurors never saw Summer because the court excused the jury prior to C1's testimony so that Summer would be on the witness stand, out of view, before the jury returned. This procedure eliminated the possibility that the jurors might be swayed by the presence of "[a] cute little kid with her cute dog," as the defendant feared.[14] After examining the record in the present case, we conclude that the trial court properly exercised its discretion in permitting Summer to sit near C1 during her testimony. We therefore reverse the judgment of the

Appellate Court.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to render judgment affirming the judgments of the trial court.

In this opinion the other justices concurred.

* In accordance with our policy of protecting the privacy interests of victims of sexual assault and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

** This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Rogers and Justices Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson. Although Chief Justice Rogers was not present when the case was argued before the court, she has read the briefs and appendices, and listened to a recording of oral argument prior to participating in this decision.

[1] To be consistent with the Appellate Court's decision in the present case, we refer to the victims as C1, C2 and C3, and refer to the defendant's former girlfriend as GF. See *State* v. *Devon D.*, 150 Conn. App. 514, 516, 90 A.3d 383 (2014).

[2] We granted the state's petition for certification to appeal, limited to the following two questions: First, "[d]id the Appellate Court properly conclude that the trial court erred by joinder of the three sexual assault cases against the defendant?" *State* v. *Devon D.*, 314 Conn. 909, 100 A.3d 402 (2014). Second, "[d]id the Appellate Court properly determine that the trial court's decision to allow an eight year old victim to testify accompanied by a comfort canine constituted an abuse of discretion?" Id.

[3] Although the trial court did not rule specifically on whether the evidence would have been cross admissible, it instructed the jury that the evidence in each case was admissible in the other cases to prove the defendant's propensity to commit crimes of an abhorrent and compulsive sexual nature. We conclude that the Appellate Court properly reviewed the issue of whether the evidence was cross admissible to show propensity because "both parties address[ed] this claim in light of the propensity standard for the admission of misconduct evidence in cases concerning crimes of a sexual nature that was adopted in *State* v. *DeJesus*, supra, 288 Conn. 470–74"; *State* v. *Devon D.*, supra, 150 Conn. App. 522 n.5; and because the test for admitting misconduct evidence to show a common scheme or plan also applies to admitting misconduct evidence to show a propensity to commit crimes of an abhorrent and compulsive sexual nature. See *State* v. *DeJesus*, supra, 476–77.

[4] When the trial in the present case took place, there was a presumption in favor of joinder. Although the presumption no longer applies; see *State* v. *Payne*, supra, 303 Conn. 548, 549; the trial court's reliance on the presumption is not dispositive because the question before us on appeal remains the same. That question is whether the defendant has satisfied his burden of "showing that the denial of severance resulted in substantial injustice, and that any resulting prejudice was beyond the curative power of the court's instructions." (Internal quotation marks omitted.) *State* v. *LaFleur*, supra, 307 Conn. 159.

[5] In *Boscarino*, we identified the factors that a trial court should consider in determining whether separate trials might be necessary to "avoid undue prejudice resulting from consolidation of multiple charges for trial. These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Internal quotation marks omitted.) *State* v. *LaFleur*, supra, 307 Conn. 156.

[6] Because we conclude that the evidence was cross admissible, we need not consider whether the trial court properly applied the *Boscarino* factors. *State* v. *LaFleur*, supra, 307 Conn. 155 ("[w]here evidence is cross admissible . . . our inquiry ends"); *State* v. *Pollitt*, 205 Conn. 61, 68, 530 A.2d 155 (1987) (when evidence is cross admissible, "the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial").

[7] The defendant does not raise a formal challenge to the trial court's instructions and does not cite to any specific language in the charge. In

addition, defense counsel did not object or take exception to the trial court's instructions to the jury at trial.

[8] As the Appellate Court noted in its decision, there is a difference between service dogs, comfort dogs, therapy dogs, companion dogs and facility dogs, and these and additional terms are often used interchangeably. See *State* v. *Devon D.*, supra, 150 Conn. App. 538 n.10. Hereinafter, we use the term "dog" or refer to Summer by name.

[9] General Statutes § 54-86g (b) provides: "In any criminal prosecution of an offense involving assault, sexual assault or abuse of a child twelve years of age or younger, the court may, upon motion of the attorney for any party, order that the following procedures be used when the testimony of the child is taken: (1) Persons shall be prohibited from entering and leaving the courtroom during the child's testimony; (2) an adult who is known to the child and with whom the child feels comfortable shall be permitted to sit in close proximity to the child during the child's testimony, provided such person shall not obscure the child from the view of the defendant or the trier of fact; (3) the use of anatomically correct dolls by the child shall be permitted; and (4) the attorneys for the defendant and for the state shall question the child while seated at a table positioned in front of the child, shall remain seated while posing objections and shall ask questions and pose objections in a manner which is not intimidating to the child."

[10] We agree with the Appellate Court's conclusion that the defendant waived any right to assert that Summer's presence violated his constitutional right of confrontation. See *State* v. *Devon D.*, supra, 150 Conn. App. 538 n.9.

[11] The record indicates that Summer was, in fact, put into place on the stand, out of view, before the jurors entered the courtroom for C1's testimony. There is nothing in the record to suggest that the jurors ever saw Summer, and the defendant does not claim that the jurors ever viewed the dog.

[12] The Appellate Court concluded that the defendant had waived his claim that the trial court's ruling violated his constitutional right of confrontation; *State* v. *Devon D.*, supra, 150 Conn. App. 538 n.9; see footnote 10 of this opinion; and noted that, because the cases were being remanded for new trials, there was no need to consider whether any possible prejudice to the defendant had been cured by the trial court's instructions. *State* v. *Devon D.*, supra, 550 n.13. Those questions are not before us in this certified appeal, which is limited to whether the Appellate Court properly determined that the trial court had abused its discretion in permitting Summer to sit near C1 while she testified. To the extent that the defendant has referred to these issues in his brief, both claims are unavailing. Not only do we agree with the Appellate Court's conclusion that the defendant waived any confrontation clause claim, but there is nothing in the record to suggest that Summer's presence interfered with the ability of defense counsel to view or cross-examine C1, or interfered with the jury's view of C1. Similarly, although the defendant makes the blanket statement that he was harmed by Summer's presence because it "implied that C1 had been traumatized . . . made her more sympathetic . . . [and] implied she [was] telling the truth," he refers to nothing in the record to substantiate this statement.

[13] Because truthful and reliable testimony is an essential component of a fair trial, a finding that an accommodation will help a witness to testify more reliably also constitutes a finding that the accommodation is necessary.

[14] The jury was instructed that "[t]he witness [C1] is anxious about testifying in front of a group of people. The dog is not present due to any concern the witness has with the defendant's presence." The court also informed the jurors that C1 had only just met Summer, and that they were to disregard Summer's presence and to "[t]hink of the dog like an interpreter, an aid to get the witness' testimony across to you more clearly." To the extent that the defendant now claims that the trial court's instructions actually exacerbated any prejudice to the defendant, we note that defense counsel specifically requested the foregoing instructions.